MUNGER, TOLLES & OLSON LLP
Edward G. Dane (SBN 143195)
ted.dane@mto.com
Peter E. Gratzinger (SBN 228764)
peter. gratzinger@mto.com
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, California 90071-1560
Telephone:   (213) 683-9100
Facsimile:    (213) 687-3702

witkowlaw | a professional law corporation
Brandon J. Witkow (SBN 210443)
bw@witkowlaw.com
21031 Ventura Boulevard, Suite 603
Woodland Hills, California 91364
Tel:   818.296.9508
Fax:   818.296.9510

OSBORNE LAW LLC
John W. Osborne (Admitted Pro Hac Vice)
josborne@osborneipl.com
33 Habitat Lane
Cortlandt Manor, New York 10567
Tel:    (914) 714-5936
Fax:    (914) 734-7333

WATTS LAW OFFICES
Ethan M. Watts (SBN 234441)
emw@ewattslaw.com
12340 El Camino Real, Suite 430
San Diego, California 92130
Tel:    (858) 509-0808
Fax:    (619) 878-5784

Attorneys for Plaintiff and Counter-Defendant
AMERANTH, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERANTH, INC. a Delaware corporation,<br><br>                         Plaintiff,<br><br>vs.<br><br>GENESIS GAMING SOLUTIONS, INC. et al.<br>                         Defendants. | Case No. SA Case Nos. SA 11-cv-0189-AG (RNBx); SA 8:13-00720-AG-(RNBx)<br><br>**AMERANTH'S OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY OF THE '650 AND '909 PATENTS PER 35 U.S.C. § 101**<br><br>Judge: Hon. Andrew J. Guilford<br>Date: Dec. 22, 2014 at 10:00 AM<br>Place: Courtroom 10D |

25131832.2

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................... 1

II.     THE CHALLENGED CLAIMS .............................................................. 2

        1.   Claims 6 and 7 of the '650 Patent Are Not Directed To Generic "Employee Scheduling" ..................................................... 2

        2.   The Claims of the '909 Patent Are Not Directed To Generic "Employee Scheduling" ..................................................... 5

III.    ARGUMENT ........................................................................................... 7

    A.   Legal Standard ............................................................................... 7

    B.   Defendant's *Alice* Analysis Fails at Step One ......................................... 8

        1.   Defendants' Motion Fails Because They Have Failed To Articulate A Supportable "Abstract Idea" ................................... 8

        2.   The Purpose Of The Claimed Inventions Is Not "Abstract" ...... 10

    C.   Defendants' Analysis Of *Alice* Step Two Is Also Flawed .................. 12

        1.   Defendants Fail To Address The Claims As An "Ordered Combination" ................................................................................. 13

        2.   Defendants Fail To Show That The Limitations Of The Dependent Claims Are "Conventional Activity" ...................... 15

    D.   Defendants Have Not Demonstrated Any Risk Of Preemption ........... 19

    E.   The Systems Described In `909 Claim 14 And Its Dependent Claims Are Not Abstract Concepts ...................................................... 20

IV.     CONCLUSION. ..................................................................................... 22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alice Corp. Pty. Ltd. v. CLS Bank Intern*,
    134 S.Ct. 2347 (2014) ..............................................................passim

*Am. Hoist & Derrick Co. v. Sowa & Sons*,
    725 F.2d 1350 (Fed. Cir. 1984) ........................................ 11

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
    133 S. Ct. 2107 (2013) ...................................... 19

*Aventis Pharma S.A. v. Hospira, Inc.*,
    675 F.3d 1324 (Fed. Cir. 2012) ........................ 18

*Bilski v. Kappos*,
    561 U.S. 593 (2010) ........................................ 12

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed.Cir. 2014) ........................ 11

*Cal. Inst. of Tech. v. Hughes Commc'n Inc.*,
    --- F.Supp.3d ----, No. 2:13-cv-07245-MRP-JEM, 2014 WL 5661290
    (C.D. Cal. Nov. 3, 2014) ..............................................passim

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.*,
    717 F.3d 1269 (Fed. Cir. 2013) (en banc) (Rader, J. concurring)...................... 8

*Data Distrib. Techs., LLC v. Brer Affiliates, Inc.*,
    Civ. No. 12-4878, 2014 WL 4162765 (D.N.J. Aug. 19, 2014)........................... 9

*Diamond v. Diehr*,
    450 U.S. 175 (1981) ........................................... 1, 13, 21

*HTC Corp. v. IPCom GmbH & Co., KG*,
    667 F.3d 1270 (Fed. Cir. 2012) .......................... 9

*In re Rambus, Inc.*,
    753 F.3d 1253 (Fed. Cir. 2014) ................................ 14, 15

*In re Yamamoto*,
    740 F.2d 1569 (Fed. Cir. 1984) ................................ 14

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Mayo v. Collaborative Servs. V. Prometheus Labs., Inc.,*
132 S. Ct. 1289 (2012) ...................................................................passim

*McRO, Inc. v. Sega of Am., Inc.,*
2014 WL 4749601 (C.D. Cal., Sept. 22, 2014)................................. 19

*Microsoft Corp. v. i4i Ltd. P'ship,*
131 S. Ct. 2238 (2011) ...................................................................... 8

*O2 Micro Int'l Ltd. v. Beyond Innovation,*
521 F.3d 1351 (Fed. Cir. 2008) ......................................................... 9

*Planet Bingo, LLC v. VKGS LLC,*
576 Fed. App'x 1005 (Fed. Cir. 2014) ............................................. 11

*PowerOasis, Inc. v. T-Mobile USA, Inc.,*
522 F.3d 1299 (Fed. Cir. 2008) ....................................................... 11

*Q.I. Press Controls, B.V. v. Lee,*
752 F.3d 1371 (Fed. Cir. 2014) ....................................................... 15

*Ultramercial, Inc. v. Hulu, LLC,*
No. 2010-1544, slip op. (Fed. Cir. Nov. 14, 2014) ........................... 12

**FEDERAL STATUTES**

35 U.S.C. § 101................................................................................passim

## I.     <u>INTRODUCTION</u>

In their second motion for summary judgment pursuant to 35 U.S.C. § 101, Defendants attack the validity of certain "dealer-related" system claims of the '650 and '909 patents. Defendants' motion fails because they misapply the law at both steps of the *Alice* analysis.

As with their first motion, which concerned the `969 patent, Defendants propose an "abstract idea" that does not correspond to the scope of the claims as a whole and as they were construed by this Court. Indeed, as with their first § 101 motion, Defendants make no reference to the Court's claim construction, and ignore large portions of the claims at issue. Instead, Defendants propose an "abstract idea" that relates only a very limited subset of the claim limitations, and then perform an obviousness-like analysis to that subset of claim limitations. Defendants' approach is fundamentally flawed, and their motion, like the last one, should be denied.

In particular, Defendants argue that the Court can simply disregard all the limitations of claim 1 of each of the `650 and `909 patents, since those claims were not allowed in the reexaminations. That is error. The limitations within the independent claims are still part and parcel of the asserted dependent claims, and they must be part of any analysis of invalidity. Prior art plays "no role" in the first part of the *Alice* test. *Cal. Inst. of Tech. v. Hughes Commc'n Inc.*, --- F.Supp.3d ----, No. 2:13-cv-07245-MRP-JEM, 2014 WL 5661290, at *11, *13 (C.D. Cal. Nov. 3, 2014) (citing *Alice Corp. Pty. Ltd. v. CLS Bank Intern*, 134 S.Ct. 2347 (2014)). Thus, when applying the first part of the *Alice* test, it makes no sense to ignore a subset of claim limitations simply because the patent office has determined that they are found in the prior art. Moreover, the Supreme Court has rejected the "point of novelty" approach to determining patent eligibility. *Id*. at *10. Thus, at the second step, "[i]t is inappropriate to ***dissect the claims into old and new elements*** and then to ignore the presence of the old elements in the analysis." *Id*. (quoting *Diamond v. Diehr*, 450 U.S. 175, 188 (1981). Defendants' decision to focus their § 101 analysis

1  exclusively on only a few limitations of the asserted claims is at odds with clear

2  Supreme Court precedent and fatal to their motion.

3       When the challenged claims are considered as a whole, as they must be, it is

4  clear that they claim detailed, highly specific real time systems for improving poker

5  room operations in physical casinos.  The claims are not "abstract" and pose no

6  danger of preempting the generic field of "employee scheduling."  Defendants'

7  motion for summary judgment should therefore be denied.

8  **II.**     **THE CHALLENGED CLAIMS**

9      **1.**     **Claims 6 and 7 of the '650 Patent Are Not Directed To Generic "Employee Scheduling"**

10

11     Defendants argue that claims 6 and 7 of the '650 patent, and all claims of the

'909 patent, are directed to "employee scheduling."  Mot. at 11.  Claim 7 of the '650

12 patent depends from claim 1, and thus requires all of the following elements:

13
    1.   A system for real time operational support of poker
14     gaming functions for use in physical casino environments
    comprising:
15
    a suite of computerized gaming application software
16     programs configured for physical casino operations that
    are linked together to provide real time operational support
17     for live poker gaming functions, said suite including
    software programs configured to facilitate electronic
18     player waitlisting and public display or marquee functions
    and related functions in support of poker gaming
19     functions;

20     a central database for storing said suite of poker or gaming
    application software programs and player data, wherein
21     said central database is configured to allow the continuous
    synchronization of the player data with another database
22     that is unique to a particular physical casino environment;

23     an application software program server for facilitating
    execution of said poker or gaming application software
24     programs; wherein at least one of said application software
    programs is configured to process player or prospective
25     player information for generation and updating of a
    waitlist, wherein the said application software program is
26     further configured to associate particular player or
    prospective player information with at least one unique
27     identifier, and wherein the said application software
    program is further configured to update the waitlist after

28

player or prospective player information is added, modified or deleted;

at least one client computing or display device on which said poker or gaming application software programs or data may be executed, linked or displayed;

at least one user interface configured for use by casino staff, wherein said user interface is associated with the at least one client computing or display device, wherein said user interface is configured to display and/or enable initiation, execution and interaction with the application software programs and data stored on the central database; and

at least one public display or marquee interface configured for simultaneous viewing by a multiplicity of players or prospective players from within a physical casino or poker room; wherein said public display or marquee interface is configured to display information by use of said at least one unique player identifier to facilitate and streamline casino operations by displaying information sufficient to enable a multiplicity of simultaneous players or prospective players to view displayed seating, prioritization and waitlisting information and wherein information presented via said public display or marquee interface is updated in real time from the suite of application software programs;

wherein said application software program server enables communication and transmission of data between the central database, the at least one client computing or display device and the at least one public display or marquee interface; wherein the central database, application software program server, at least one client computing or display device and application software programs are configured to facilitate integrated real time operational support for poker gaming functions within a physical casino and wherein information generated by or associated with a particular application software program may also be used by another related gaming application software program.

7.      The system of claim 1 wherein at least one of the application software programs of the suite of programs is configured to facilitate public display of dealer scheduling and/or rotation information.

Defendants' characterization of this system claim as being directed to the "abstract idea" of generic "employee scheduling" is nonsensical. The claimed system requires a specific configuration of several components, including "a suite of computerized gaming application software programs," a "central database,"

1    "another database that is unique to a particular physical casino environment," an

2    "application software program server," a "client computing or display device," a

3    "user interface configured for use by casino staff," and a "public display or marquee

4    interface."  This system must be configured to provide "realtime operational

5    support."  Among the tasks that this system is configured to do are, e.g., "generation

6    and updating of a waitlist," where the system is configured to "update the waitlist

7    after player or prospective player information is added," and "display[] seating,

8    prioritization and waitlisting information."  These exemplary functions have nothing

9    at all to do with "employee scheduling."

10           Certainly, claim 7 of the '650 patent does require, as one of its many

11   limitations, that the system must be configured to "facilitate public display of dealer

12   scheduling and/or rotation information."  "Dealer scheduling and/or rotation," as

13   used in the claim, however, is not generic "employee scheduling" as that term is

14   conventionally understood.  When read in the context of the claimed system, which

15   is directed to "real time operational support of poker gaming functions," the claim

16   language plainly refers to the rotation of dealers to the poker tables to be serviced.

17           According to the Court's claim constructions, "real time" means "providing

18   current status or response within seconds," and "operational support" means

19   "implementing, managing and reporting on crucial operations."  *See* Dkt. 164 at 6-8,

20   41.  This is distinct from, e.g., scheduling vacation days for poker room staff, which

21   is unrelated to real time operational support as construed by the Court.  The

22   distinction is made clear in the specification, which states, in describing an

23   embodiment of the "Dealer Coordinator" functionality, that "[t]he feature allows

24   dealers to register themselves into the system *upon the beginning of a work shift*.

25   The system using random generation *schedules dealers for certain games and

26   breaks* based upon preloaded dealer preferences."  *See* Mot. Exh. 3, '650 Patent at

27   col. 23:59-65 (emphasis added).  As the specification makes clear, "scheduling

28

and/or rotations" take place **within** work shifts, and does not refer to the scheduling *of* work shifts.

Moreover, the specific additional claimed functionality in claim 7 of the '650 patent – public display of dealer scheduling – would make no sense as applied to generic "employee scheduling" in the sense of scheduling work shifts. There would be no need for patrons and staff in the poker room to have system configured to provide a real time public display of whether a particular dealer was going to be on vacation the next month. No such generic employee scheduling functionality is described in the specification, and it defies common sense. Thus, a person of ordinary skill in the art would understand "dealer scheduling and/or rotations," in the context of the claims, to mean "within-shift" scheduling of dealer rotations in the poker room.

In sum, "employee scheduling" is, at best, a very broad and imprecise characterization of only one of the many limitations of the systems claimed in the '650 patent.

**2.    The Claims of the '909 Patent Are Not Directed To Generic "Employee Scheduling"**

Defendants likewise argue that all the system claims of the '909 patent are directed to generic "employee scheduling." Unlike the claims of the '650 patent, the claims of the '909 patent do not require some of the `650 patent functionality that is completely distinct from dealer coordination functions, such as player waitlist functionality. Nonetheless, generic "employee scheduling" is a wholly inaccurate characterization of the claimed systems, and is once again devoid of any consideration of the Court's claim constructions. For example, claim 2 of the '909 patent requires:

1.    A system for real time operational support of casino dealer coordinator functions comprising:

a suite of computerized dealer coordinator application software programs linked together to provide real time operational support for casino dealer coordinator gaming

functions, said suite including programs configured to facilitate electronic scheduling and dealer rotation functions in support of casino dealer coordinator functions;

a central database for storing said suite of dealer coordinator application software programs and other data;

an application software program server for facilitating execution of said dealer coordinator application software programs;

at least one client computing or display device on which said dealer coordinator application software programs or data are configured to be executed, linked or displayed; and

at least one user interface associated with the at least one client computing or display device, said user interface being configured to display and/or enable initiation, execution, and interaction with the application software programs and data stored on the central database;

wherein said application software program server enables communication and transmission of data between the central database and the at least one client computing or display device; wherein the central database, application software program server, at least one client computing or display device and application software programs are configured to facilitate integrated real time operational support for casino dealer coordinator functions and wherein information generated by or associated with a particular application software program is configured to be used during execution of another related gaming application software program.

2.    The system of claim 1 wherein at least one of the application software programs of the suite of programs is configured to facilitate public display of dealer information.

For the same reasons as discussed above with respect to the '650 patent, it is clear from both the context of the claim and the specification that "dealer scheduling" means scheduling dealer actions within shifts, not scheduling dealer shifts.  Furthermore, this claim requires both dealer scheduling *and* dealer rotation. Thus, even if "dealer scheduling" includes scheduling a dealer to come to work the following Tuesday, as Defendants incorrectly contend, that does not account for the "dealer rotation" limitation, which plainly requires movement of dealers from table

to table (or to another task, e.g., a break).  Thus, the claim is plainly much narrower and more specific than "employee scheduling."  Furthermore, the required "public display of dealer information" is neither necessary to generic "employee scheduling" nor sufficient to establish that such "employee scheduling" is taking place.  It is entirely possible to perform dealer scheduling and rotation without publicly displaying anything.

Aside from requiring functionality that is separate and distinct from "employee scheduling," the system claims of the '909 patent have very specific structural requirements that go far beyond a simple instruction to "apply [employee scheduling] with a computer."  *C.f. Alice*, 134 S.Ct. at 2350.  To illustrate, compare the computerized "employee scheduling" that Mr. Risnoveanu claims to have been practicing using an Excel spreadsheet, Mot. at 16, with the claims of the '909 patent.  Claim 2 requires a linked suite of "dealer coordinator application software programs," a limitation which would not be met by a generic spreadsheet program.  Shamos Decl. ¶¶ 14-15.  Moreover, claim 2 requires that "information generated by or associated with a particular application software program is configured to be used during execution of another related gaming application software program." *Id.* Thus, information must be shared among the linked suite of programs.  The combination of limitations found in claim 2 describe a very particular computerized system. **Id. ¶16.** Thus, the claims plainly do not cover every generic computer implementation of "employee scheduling," but rather, a highly specific system that provides several integrated functions, one of which is dealer scheduling.  *Id.*

## III.   ARGUMENT

### A.   Legal Standard

The Supreme Court in *Alice* articulated a two-step framework for analyzing patent-eligibility under 35 U.S.C. §101.  First, the Court must determine whether the claims at issue are directed to "patent-ineligible concepts," namely, "laws of nature, natural phenomena, and abstract ideas."  *Alice*, 134 S. Ct. at 2355.  If (and only if)

the claims are directed to one of these "patent-ineligible concepts," the Court conducts a search for an "inventive concept," an "element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."  *Id.* (*quoting Mayo v. Collaborative Servs. V. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012)).  In this second step, the claim elements must be considered both "individually" and "as an ordered combination" to determine whether the "additional elements," i.e., those that go beyond the patent-ineligible concepts, "transform the nature of the claim" into patent-eligible subject matter.  *See id.*

Defendants have the burden to prove invalidity under §101 by clear and convincing evidence.  *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011) ("We consider whether § 282 requires an invalidity defense to be proved by clear and convincing evidence. We hold that it does."); *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1304–05 (Fed. Cir. 2013) (en banc) (Rader, J. concurring) (clear and convincing standard applies to §101 because it is an invalidity defense to a duly issued patent claim).

### B.  **Defendant's *Alice* Analysis Fails at Step One**

#### 1.  **Defendants' Motion Fails Because They Have Failed To Articulate A Supportable  "Abstract Idea"**

As discussed above, "employee scheduling" incorrectly characterizes the systems described in claims 6 and 7 of the '650 patent and the claims of the '909 patent.  Defendant's fail to show that the many other unique features of the claimed inventions, such as player waitlists, dealer rotation, public display of dealer information, or the very particular configuration of the claimed system, are somehow secondary or subservient features that are readily subsumed within "employee scheduling."

Defendants' error appears to stem, at least in part, from an excessive focus on the dependent claims, as opposed to the independent claims from which they

depend.  But Defendants cannot simply ignore the independent claims.  Judge Pfaelzer, whose methodology the Defendants have urged the Court to follow, has made very clear that under Supreme Court precedent, "prior art plays no role" in the first step of the *Alice* analysis.  *Cal. Tech.*, 2014 WL 5661290, at *13.  As such, there can be no justification for simply ignoring the limitations of the independent claims in considering whether the claims are directed to an abstract idea, and Defendants cite no authority for such an approach.  Because Defendants fail to articulate a defensible "abstract idea," their motion for summary judgment fails out of the starting gates.

As the Court noted in denying Defendants' first motion for summary judgment based on Section 101, "[i]t is not the Court's role to develop winning theories for the parties."  *See* Dkt. 215 (Nov. 12, 2014 Order) (citing *Data Distrib. Techs., LLC v. Brer Affiliates, Inc.*, Civ. No. 12-4878, 2014 WL 4162765, at *13 (D.N.J. Aug. 19, 2014).  The Court has no independent duty to police the validity of patent claims.  Patent invalidity arguments, like many other defenses, can be waived.  *See, e.g.*, *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1278 (Fed. Cir. 2012) (accused infringer cannot argue for first time on appeal that claim is indefinite).  Nor is the first step of the *Alice* analysis akin to claim construction, requiring the Court to articulate an "abstract idea" even when Plaintiff cannot.  First, as *Alice* makes clear, the claim may not be directed to an abstract idea at all – "abstractness" is presumably the exception and not the rule.  Second, the context is completely different.  The Court must construe claims to guide the jury in making its determination on infringement.  *See O2 Micro Int'l Ltd. v. Beyond Innovation*, 521 F.3d 1351 (Fed. Cir. 2008).  By contrast, determining whether a claim is directed to an "abstract idea" is an end in itself, because if it is not, the Section 101 inquiry ends. *See Alice*, 134 S. Ct.  2347 at 2355.  If the Court agrees with Ameranth that Defendants have failed to plausibly identify an "abstract idea" to which the challenged claims are directed, the Court should deny the motion. *See id.*

**2.      The Purpose Of The Claimed Inventions Is Not "Abstract"**

Defendants rely on Judge Pfaelzer's proposal that courts perform the first step of the *Alice* analysis by determining the "purpose" of the invention, and deciding whether the "purpose is abstract."  Mot. at 9 (citing *Cal. Inst. of Tech. v. Hughes Commn'c Inc.*, --- F.Supp.3d ----, 2014 WL 5661290, at *3 (C.D. Cal. Nov. 3, 2014).  Judge Pfaelzer's approach, of course, must not be read to alter the scope of what the Supreme Court has instructed courts to do, which is to "determine whether the claims at issue are *directed to* one of those patent-ineligible concepts." *See Alice*, 134 S.Ct. at 2355 (emphasis added).  In any event, Defendants fail to apply Judge Pfaelzer's methodology.  Defendants leap directly to their conclusion that the claims cover an "abstract idea" without either articulating the alleged "purpose" for each claimed invention or analyzing whether that purported "purpose" is, in fact, "abstract." *See* Mot. at 11.

Like the Court, Ameranth is not inclined to do Defendants' work for them.  Nonetheless, it is clear that the purpose of each of the challenged claims, however articulated, is not "abstract."  To take one example, since many of the claimed systems include, as one of their components, a "public display" that is configured to display certain types of dealer information throughout the physical casino poker room in support of the real time operation of the poker room's function, one of the "purposes" of those claims must be the public display of dealer information in a poker room in support of poker room operations.  There is nothing "abstract" about this functionality (which, it bears emphasis, is only one aspect of the overall "purpose" of the claimed inventions).  Judge Pfaelzer explains that "in evaluating whether a purpose is abstract, the court can rely on Supreme Court precedents," and that "[a]ge-old ideas are likely abstract, in addition to basic tools of research and development, like natural laws and fundamental mathematical relationships." *Cal. Tech.*, 2014 WL 5661290, at *13.  Real time public display of dealer information in support of poker room operations does not fit any of these categories.

An "age-old" idea is an idea that the Court can instantly and categorically recognize, as a matter of law, as belonging to the public domain.  The cases identified by Judge Pfaelzer as involving "age-old" ideas include *Alice*, *BuySafe*, and the Federal Circuit's non-precedential opinion in *Planet Bingo*.  *Cal. Tech.*, 2014 WL 5661290, at \*10.  *Alice*, of course, involved the age-old business method of mitigating settlement risk.  *Id.* at \*6 (citing *Alice*, 134 S. Ct. at 2359).  *Planet Bingo* was "directed to a computerized bingo game."  *Id.* at \*10 (citing *Planet Bingo, LLC v. VKGS LLC*, 576 Fed. App'x 1005 (Fed. Cir. 2014) (nonprecedential)).  The claims in *BuySafe* were "squarely about creating a contractual relationship—a 'transaction performance guaranty'—that is *beyond question of ancient lineage*."  *Id.* (quoting  *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed.Cir. 2014)) (emphasis added).

Another example of an "age-old idea" might be the game of poker itself.  A system for real time public display of dealer information in support of poker room operations, however, is not an "age-old idea" and is completely unlike any of the above examples.  Indeed, Ameranth contends that it is highly novel, and the USPTO has agreed -- twice for each of the allowed claims.  The system elements that are directed to this "purpose" are some of the distinguishing features of the asserted claims that allowed them to survive a very thorough re-examination initiated by defendant Genesis.  The prior art that Genesis asserted in the re-examination, some of which is recycled in this motion, contain no suggestion of such a display.  It is remarkable that, having failed to convince the patent examiner upon close inspection of all the prior art it could muster that this idea was non-novel or obvious, Genesis now asks the Court to decide that it is an "age old idea" as a matter of law.  That argument should be rejected.  *Cf. PowerOasis, Inc. v. T-Mobile USA, Inc.,*  522 F.3d 1299, 1304 (Fed. Cir. 2008) (quoting *Am. Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1360 (Fed. Cir. 1984) ("When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added

burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.").

The challenged claims are obviously not directed to "[b]asic tools of research and development, like natural laws and fundamental mathematical relationships." *Cal. Tech.*, 2014 WL 5661290, at \*13.  As for Supreme Court precedents, nothing comes close.  *Alice* and *Bilski*, for example, were fundamentally about contractual relationships and financial transactions implemented with the assistance of computers.  *See Alice*, 134 S. Ct. at 2354; *Bilski v. Kappos*, 561 U.S. 593, 601 (2010).  The Federal Circuit's most recent §101 decision, *Ultramercial,* follows squarely in this line of cases.  *See Ultramercial, Inc. v. Hulu, LLC,* No. 2010-1544, slip op. (Fed. Cir. Nov. 14, 2014).  In that case, the Federal Circuit determined that the challenged method was directed to "using advertising as an exchange or currency," and therefore, was abstract. *Id.* at 10.   Ameranth's claims, by contrast, are not directed to adjusting contractual relationships or attempting to capture a form of financial transaction.  Nor are the claims anything like the naturally-occurring physiological relationships at issue in *Mayo*, 132 S.Ct. at 1293–94.

In sum, Defendants made no attempt to properly and completely identify the purpose of each claimed invention, or to demonstrate that each such purpose is abstract.  Nor could they, as shown by the single example of the real time public display of dealer information in support of poker room operations, which is not directed to "abstract" purposes, such as "age-old ideas," mathematical formulas, or adjustment of contractual relations.

## C.   Defendants' Analysis Of *Alice* Step Two Is Also Flawed

Claim 1 of the '650 patent contains 482 words.  Claim 7 adds 32 more words.  Unsurprisingly, just as they did at the first step of the *Alice* test, Defendants ignore

the detailed requirements of claim 1 of each of the patents and focus only on dependent claim limitations.  Defendants argue that "all of the limitations of each respective independent claim 1 have already been conclusively established as *not providing patentable subject* matter by the reexaminations," and then provide a much abbreviated claim chart purporting to show that the elements of Claim 7 are anticipated or rendered obvious by various alleged prior art references.  Mot. at 12, 17-20.  In effect, Defendants attempt to use Section 101 as a means to reargue the PTO's finding in reexamination that the dependent claims are neither anticipated nor obvious.  This approach is not consistent with binding precedent.

### 1.    Defendants Fail To Address The Claims As An "Ordered Combination"

In the second part of the *Alice* analysis, the claim elements must be considered both individually and as an "ordered combination."  *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1297-98).  As Judge Pfaelzer explains, when viewing claim elements as an ordered combination, "the court should not ignore the presence of any element, even if the element, viewed separately, is abstract. If the ordered combination of elements constitutes conventional activity, the claim is not patentable, but courts should remember that a series of conventional elements may together form an unconventional, patentable combination."  *Cal. Tech.*, 2014 WL 5661290, at *3 (emphasis added).  Further, "courts must follow the guidance of *Diehr*, which discourages courts from "'dissecting a claim into old and new elements'."  *Id.* at *11 (citing *Diehr*, 450 U.S. 189 n. 12).  Defendants' analysis fails from the outset, because it neglects to consider the complete set of claim limitations, as construed by the Court, as an "ordered combination."  Defendants choose instead to dissect out particular claim elements found in the dependent claims and attempt to prove that those specific claim elements are in the prior art – precisely the approach rejected in *Diehr*.

For example, with reference to Claims 6 and 7 of the '650 patent, Defendants fail to consider player wait-listing functionality, or whether combining that element (and numerous other elements) in an integrated system with the additional limitations of the dependent claims, might "together form an unconventional, patentable combination." *Id.* at *3. Similarly, with respect to the '909 patent, Defendants fail to consider whether the elements of the independent claim, such as a "suite of computerized dealer coordinator application software programs," that provide "real time operational support," for both electronic scheduling *and* dealer rotation, and where that suite of programs is "linked" so that information generated by or associated with one application is used during the execution of another application, might, with the addition of the limitations of the dependent claims, "together form an unconventional, patentable combination." *Id.*

Defendants' decision to ignore the elements of the independent claims has no legal justification. While Ameranth plainly cannot assert infringement of the cancelled independent claims in this litigation, it must still prove the presence of every element of those independent claims when proving infringement of the claims that depend from them. Likewise, Defendants must address each element of the independent claims when attempting to establish invalidity of the claims that depend from them.

Indeed, contrary to Defendants' claims, the reexamination conclusions do not "establish" anything for purposes of this litigation, even with respect to anticipation or obviousness, let alone for purposes of the *Alice* analysis. The claims which were cancelled by the examiner were cancelled based on their "broadest reasonable interpretation," which is a different standard from the *Phillips* claim construction standard that was applied by the Court. *See, e.g., In re Rambus, Inc.*, 753 F.3d 1253, 1255 (Fed. Cir. 2014) (citing *In re Yamamoto*, 740 F.2d 1569 (Fed. Cir. 1984)). The reasoning behind this different standard is that in reexamination, Ameranth had the opportunity to amend and clarify its claims, whereas it has no

such opportunity in this Court.  *Id.*  Furthermore, the examiner applied a "preponderance of the evidence" standard to the invalidity analysis, rather than the "clear and convincing" standard that must apply in this litigation, and did not apply any presumption of validity.  *See, e.g., Q.I. Press Controls, B.V. v. Lee*, 752 F.3d 1371, 1379 (Fed. Cir. 2014).  Defendants cite no authority for the proposition that they can rely upon the findings of the examiner, made using different claim constructions and a much lower evidentiary standard, to "establish" that certain claim elements are in the prior art for purposes of this litigation.

### 2. Defendants Fail To Show That The Limitations Of The Dependent Claims Are "Conventional Activity"

Further, Defendants' attempt to perform the second part of the *Alice* analysis flawed even as to the limited claim elements that they chose to analyze.  Defendants contend that the limitations of claims 6 and 7 of the '650 and claims 2-4 of the '909 patent are found in some combination of the '650/'909 specification,  U.S. Patent No. 6,823,315 (the '315 patent); an article about the "Timepoint" computer program ("Cohan"), and the alleged operations of the Crystal Park Casino from 1998 to 1999, as only now recounted by the President of Defendant ITCS, Mr. Risnoveanu.  *See* Mot. at 17-20.  They are not. Further, Defendants confuse the second step of the *Alice* analysis with an analysis of obviousness.

The background of the asserted patents does nothing more than acknowledge that it was known in the prior art for dealers to have schedules and to rotate.  *See* Mot. at 17 (quoting '650 patent at Col. 7:34-39).  The '315 patent relates to scheduling generic work shifts for employees.  An example given in the patent, and quoted in Defendants' motion, is a supermarket that needs to make sure that enough baggers and cashiers are working at any particular time of day.  Mot. at 21 (quoting '315 Patent at col. 1:10-49).  This is inapposite to real time dealer rotation and dealer scheduling, which, as explained above, are not directed to making sure that there are an adequate number of dealers staffing the casino, but rather, relate to the

within-shift actions of the dealers, and moving dealers among tables and other actions.  Similarly, the Cohan article relates to scheduling of shifts, rather than scheduling of within-shift actions, by "automatically figuring vacation days, personal days, overtime and on-call situations."  Mot. at 15 (quoting Mot. at Ex. 12).

The self-serving declaration of Mr. Risnoveanu is likewise inapposite, even if it is not entirely precluded, as it should be.[1]  Mr. Risnoveanu claims to remember that at some unspecified time (not provided in the declaration, but asserted to be 1998 in Defendants' Motion), he prepared dealer schedules at the Crystal Park Casino using Excel on a desktop computer.  His declaration attaches documents, never previously produced, of what purport to be "examples" of such spreadsheets, where those "examples" are dated 2009, long after the priority date of Ameranth's patents.  *See* Risnoveanu Decl. at ¶¶ 5-7 Ex. A.  Mr. Risnoveanu declares that as a Crystal Park Casino employee, he would "post the spreadsheet either on a computer or using printouts in prominent places."  *Id.* at ¶ 8.  Defendants have interpreted Mr. Risnoveanu's statement to mean, "[t]he schedules would be posted on monitors or hard copies in prominent locations," though plainly, Mr. Risnoveanu said nothing about posting schedules on monitors in prominent locations.  *See Id.* at ¶ 8; *compare* Mot. at 18.

Defendants assert that this evidence collectively "demonstrates that all of the claimed functions of the respective dependent claims were known and practiced in the industry prior to the filing of the applications leading to the patents in suit."  Mot. at 20.  It does no such thing.  For example, claim 6 of the '650 patent requires that

---

[1] No evidence about the alleged operations of the Crystal Park Casino had previously been produced during discovery or disclosed in Defendants' invalidity contentions. The Court's Standing Patent Rules require disclosure of both "The identity of each item of prior art," including alleged public use of prior art," as well as "[a]ny grounds of invalidity based on 35 U.S.C. § 101."  S.P.R. 2.5.1; 2.5.4. Thus, the declaration should be excluded, as set forth in Ameranth's evidentiary objections.

1  "one of the application software programs of the suite of programs is configured to
2  coordinate dealer scheduling and/or rotation functions."  The antecedent basis for
3  the "suite of programs" is "a suite of computerized gaming application software
4  programs configured for physical casino operations that are linked together to
5  provide real time operational support for live poker gaming functions."  None of the
6  four references cited by Defendants show a suite of such programs, wherein one of
7  the programs in that suite is configured to coordinate dealer scheduling and/or
8  rotation.  Indeed, Defendants were unable to convince the patent examiner, even
9  under a "preponderance of the evidence" standard, that such a system existed in the
10  prior art.

11      Defendants also fail to show that a "public display of dealer scheduling and/or
12  rotation information," as required by '650 claim 7, existed in the prior art.  Mr.
13  Risnoveanu's declaration seems to suggest that, in some unspecified year, after he
14  created dealer schedules "on a desktop computer using Microsoft Excel", employees
15  could come and look at the monitor of that computer to see the schedule.
16  Risnoveanu Decl. at ¶¶ 5, 8.  Plainly, however, this is not "public display of dealer
17  scheduling and/or rotation information."  The Court has already construed a related
18  term from the '650 patent, "public display or marquee functions," to mean
19  "functionality for displaying gaming or special events information suitable for
20  viewing by a multiplicity of players or prospective players." Dkt. 164 at 28.  There
21  is no evidence of where Mr. Risnoveanu's desktop computer was located or when,
22  and no suggestion that the desktop monitor was a "public display" as that term has
23  been construed by the Court.

24      Just as Defendants failed to convince the patent examiner under a
25  "preponderance of the evidence" standard that the dependent claims of the '909
26  patent are in the prior art, they fail to make a "clear and convincing" showing here.
27  For example, Claim 2 of the '909 patent, which requires "public display of dealer
28  information," is plainly an inventive concept that is not disclosed in the prior art, for

the same reasons that claim 7 of the '650 describes an inventive concept.  Likewise, claims 3 and 4 of the '909 patent, just like claim 6 of the '650 patent, describe software configurations that are not in the prior art.

Since Defendants cannot even show that these dependent claims are disclosed in the prior art, they certainly cannot show that the limitations of the dependent claims are "conventional elements."  The latter is an even higher bar, because "neither *Mayo* nor any other precedent defines conventional elements to include *everything* found in the prior art."  *Cal. Tech.*, 2014 WL 5661290, at *11.  A "conventional element" may be one that is "ubiquitous in the field, insignificant, or obvious."  *Id.* at *14.  It may be a "necessary step" for implementing the abstract idea.  *Id.*  A self-serving declaration from the accused infringer, alleging that he had done something at a particular casino at some unspecified time, does not come close to establishing a claim limitation as being a "conventional element," even if it could be considered "prior art" (which it does not appear to be).  The same is true of an obscure non-analogous patent discussing supermarket employees, and an equally obscure article about the "Timepoint" computer program from "Scott Business Computers."  Mot. at 15.  This material does not rise to the same level as, for example, the Supreme Court's observation that all doctors administer drugs and then do blood work to see the results.  *Cal. Tech.*, 2014 WL 5661290, at *14 (discussing *Mayo*, 132 S. Ct. at 1299).  The type of detailed comparison of the claim limitations to the prior art urged by Defendants belongs to Section 102 and 103, not to Section 101.  *See id.*

The Court must take care not to supplant the role of the jury in making determinations, for example, about the scope and content of the prior art, and the differences between the prior art and the claims at issue.  *See Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1332 (Fed. Cir. 2012) (identifying these as "underlying factual inquiries").  To the extent the alleged Crystal Park Casino art is not precluded outright, Ameranth should get its day in court to cross-examine Mr.

Risnoveanu about how exactly he "posted" his spreadsheet "on a computer," when he did so, and why he failed to submit this purported "prior art" to PTO in connection with his own dealer system patent applications.  To protect the role of the jury in this dispute, detailed comparison of obscure alleged prior art with the elements of the claims should take place under the rubric of invalidity and obviousness, not as part of an effort to determine whether the claimed systems cover nothing more than an "abstract idea."

### D.     Defendants Have Not Demonstrated Any Risk Of Preemption

"The concern underlying § 101 is preemption."  *Cal. Tech.*, 2014 WL 5661290, at *12.  The Supreme Court has made clear that the patent system should not grant a monopoly over "the basic tools of scientific and technological work," lest the patent system tie up the "building blocks of human ingenuity." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2109 (2013).

Defendants argue that Ameranth's claims "risk preempting using a computer to create dealer employee schedules."  Mot. at 20.  This is plainly untrue. Assuming, for example, that Mr. Risnoveanu did at some point create dealer schedules on Excel spreadsheets, he could continue doing so without any fear of infringing the asserted claims, because a great number of limitations, from waitlist management to public display, would be missing.  What Mr. Risnoveanu and his company cannot do is sell integrated software suites that meet all of the limitations of the asserted claims and steal Ameranth's innovative solutions for poker room management lock, stock, and barrel.  As Judge Pfaelzer has noted, "the court must be wary of litigants who exaggerate preemption concerns in order to avoid developing innovative workarounds." *Cal. Tech.*, 2014 WL 5661290, at *12 (citing *McRO, Inc. v. Sega of Am., Inc.*,  2014 WL 4749601, at *6 (C.D. Cal., Sept. 22, 2014)).

Defendants' preemption analysis begins with the same fatal analytical error as their abstractness analysis.  Defendants argue that  "in view of the conclusive determination during the reexamination that the limitations of the independent claims from which the above claims depend were all known in the art, the preemption concept should focus on the limitations of the claims that led to them being confirmed in the reexamination."  Mot. at 20.  Defendants cite no legal support for dissecting claims into allegedly new and old elements before performing the preemption analysis, rather than considering them as an ordered combination.  Indeed, this approach is nonsensical.  Ameranth plainly cannot "preempt" the use of any system unless it meets *both* the limitations of the independent claims and the dependent, asserted claims, since the system would not otherwise infringe.

Finally, even as to the improperly narrowed scope of Defendants' preemption analysis, which ignores the vast majority of the relevant claim limitations, Defendants' arguments are unpersuasive.  For example, a "public display" may be a "known technology," but an integrated system that includes a public display of dealer information in poker rooms was not known before Mr. Kessman and Mr. McCauley invented it, and is by no means necessary for "using a computer to create dealer employee schedules," the activity that Ameranth is allegedly in danger of preempting.  Thus, Defendants fail to show that any of the "underlying concerns" of Section 101 are implicated by the asserted claims.

**E.**    **The Systems Described In `909 Claim 14 And Its Dependent Claims Are Not Abstract Concepts**

ITCS moves separately for a determination that '909 patent claim 14 and its dependent claims are invalid under Section 101.  ITCS admits, however, that Claim 14 of the '909 patent is even narrower than claim 1 of the '909 patent, because it adds the limitation "and wherein said system is configured to facilitate automatic generation of dealer schedules and rotations based on predetermined criteria."  *Id*. at 23.  The dependent claims, of course, are narrower still.  For example, in addition to

the uniquely inventive "automatic generation" capability of claim, claims 15, 16, and 17 add to claim 14 the similar limitations as claims 2, 3, and 4 add to claim 1.  If a broader claim survives Section 101, then a narrower claim must also necessarily survive.  "Logically, adding additional elements to nonabstract claims will not make them abstract."  *Cal. Tech.*, 2014 WL 5661290, at *14. [2]

ITCS's analysis of claim 14 and its dependent claims fails for the same reason as Defendants' analysis of the other challenged claims.  ITCS argues that "the first step of the §101 determination in view of *Mayo* is limited to whether the [automatic generation] limitation is directed to an abstract concept, as the remainder of claim 14 is directed to 'well-understood, routine, conventional activity.'" Mot. at 23 (citing *Mayo,* 132 S. Ct. at 1298).  Once again, ITCS misapplies the law.  To the extent ITCS is actually talking about "step 1" of *Alice*, ITCS violates the rule that "prior art plays no role in this step." *Cal. Tech.*, 2014 WL 5661290, at *13.  If, by "the first step," ITCS actually means "the second step," ITCS is once again misapplying the law, because the "point-of-novelty" approach has been rejected by the Supreme Court, and it is improper to "***dissect the claims into old and new elements***" when determining patent eligibility.  *See Id.* at *4 (quoting *Diehr*, 450 U.S. at 188).  ITCS's argument that the "automatic generation" step is "abstract" is addressed to the wrong question and is therefore irrelevant.  When the claims are viewed as a whole, as the Supreme Court has said they must be, it is clear that the challenged

---

[2] While Defendants purport to challenge all claims of the '909 patent, the motion contains no mention of '909 claims 11 or 24, which are directed to a voice response functionality.  The motion should therefore be denied as to those claims.  Other claims are given cursory treatment, and are mentioned only in a chart that follows the motion and exceeds Defendants' page limits.  For example, claim 21 requires that the system is configured to link to special purpose casino devices. This claim further narrows the claimed system, and Defendants' conclusory assertion that the Cohan article somehow demonstrates that it is "conventional" is without merit.

1  claims are neither abstract nor risk preempting the entire field of "employee

2  scheduling," for the reasons discussed above.

3  **IV.   <u>CONCLUSION.</u>**

4       For the foregoing reasons, Ameranth respectfully requests that the Court deny

5  Defendants' second Motion for Summary Judgment based on 35 U.S.C. §101.

6

7  DATED:  December 1, 2014              MUNGER, TOLLES & OLSON LLP
                                         Ted G. Dane
8                                        Peter E. Gratzinfer

9                                        witkowlaw, a professional law corporation
                                         Brandon J. Witkow
10

11                                       OSBORNE LAW LLC
                                         John W. Osbore
12

13                                       WATTS LAW OFFICES
                                         Ethan M. Watts
14

15

16

17                                       By:    /s/ *Peter E. Gratzinger*
                                                _____
18                                             Peter E. Gratzinger

19                                       Attorneys for Plaintiff and Counter-Defendant,
                                         AMERANTH, INC.
20

21

22

23

24

25

26

27

28

AMERANTH'S OPPOSITION TO MSJ FOR INVALIDITY OF THE '650 AND '909 PATENTS