UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERANTH, INC., | CASE NO. SACV 11-00189 AG (RNBx) |
| Plaintiff, | (Consolidated with SACV 13-00720 AG (RNBx)) |
| v. | |
| | ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF THE '909 AND '650 PATENTS UNDER 35 U.S.C. § 101 (DKT. NO. 216) AND OF INVALIDITY OF THE '650, '909, AND '969 PATENTS UNDER 35 U.S.C. § 112 AND 35 U.S.C. § 103 (DKT. NO. 220) |
| GENESIS GAMING SOLUTIONS, INC., ET AL. | |
| Defendants. | |

## INTRODUCTION

Plaintiff Ameranth, Inc. ("Plaintiff") alleges that Defendants California Commerce Club, Inc. ("Commerce"), Genesis Gaming Solutions, Inc. ("Genesis"), and IT Casino Solutions, LLC ("ITCS") (collectively, "Defendants") have infringed three related U.S. Patents:

- No. 7,431,650 ("'650 Patent"), titled "Casino Poker and Dealer Management System." The '650 Patent claims systems and software programs that help casinos run poker games, including the maintenance, processing, and display of player and game information, and an electronic player wait list.

- No. 7,878,909 ("'909 Patent"), titled "Products and Processes for Operations Management of Casino, Leisure and Hospitality Industry." The '909 Patent claims systems and programs that help casinos run poker games, including the creation, modification, and display of dealer schedules based on dealer preferences and other criteria.

- No. 8,393,969 ("'969 Patent"), which has the same title as the '909 Patent. The '969 Patent also claims systems and programs that help casinos run poker games, including tracking gaming table availability, player playing time, and compensation.

Genesis and ITCS filed a motion for summary judgment that the '909 and '650 Patents are invalid under 35 U.S.C. § 101 ("§ 101 Motion"). (Dkt. No. 216.) Genesis and Commerce filed a motion for summary judgment that all three asserted patents are invalid under 35 U.S.C. § 112 and 35 U.S.C. § 103 ("§ 112 Motion"). (Dkt. No. 220.) Opposition and reply briefs were filed for both motions. (Dkt. Nos. 243, 244, 260, 264.)

Because of the overlapping subject matter, and in the interest of efficiency and clarity, the Court addresses both invalidity Motions in this Order. The concurrent motions addressing other issues are addressed in separate orders. The Court DENIES the § 101 Motion and the § 112 Motion.

## **BACKGROUND**

Plaintiff filed this case on February 2, 2011, asserting infringement of the '650 Patent and the '909 Patent.  (Compl., SACV 11-00189, Dkt. No. 1 at 8, 12.)  On August 29, 2011, the Court granted the parties' stipulation to stay the case pending reexaminations of the '650 and '909 Patents. (SACV 11-00189, Dkt. No. 64.)  On May 6, 2013, Plaintiff filed Case No. SACV 13-00720, asserting the '969 Patent, which issued on March 12, 2013.  On August 9, 2013, the Court lifted the stay in SACV 11-00189 because the USPTO had completed its reexaminations of the '650 and '909 Patents.  (SACV 11-00189, Dkt. No. 87.)  On August 12, 2013, the Court ordered Case No. SACV 13-0720 consolidated into Case No. SACV 11-0189.  (SACV 11-00189, Dkt. No. 88.)

The Court issued its Claim Construction Order on May 2, 2014.  (SACV 11-00189, Dkt. No. 164.)  On August 4, 2014, the Court granted in part and denied in part Commerce's motion for summary judgment of non-infringement of the '650 Patent.  (SACV 11-00189, Dkt No. 197.)  On November 12, the Court denied Commerce and Genesis's motion for summary judgment that the '969 Patent was invalid under 35 U.S.C. § 101.  (SACV 11-00189, Dkt. No. 215.)  Concurrent with the § 101 Motion and the § 112 Motion, the Court is hearing four noninfringement motions filed by three defendants, an accompanying motion to strike filed by Genesis, and Plaintiff's motion for summary judgment on ITCS's counterclaims.  All told, the Court will have decided five noninfringement motions for summary judgment and three invalidity motions for summary judgment, in a case involving just three patents.

Trial is set for February 10, 2015.  (Scheduling Order, Dkt. No. 90.)

**LEGAL STANDARD**

Summary judgment is appropriate where the record, read in the light most favorable to the non-moving party, shows that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those necessary to the proof or defense of a claim, as determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The burden initially is on the moving party to show the absence of a genuine issue of material fact or that the non-moving party will be unable to make a sufficient showing on an essential element of its case for which it bears the burden of proof. *Celotex*, 477 U.S. at 322-23. Only if the moving party meets its burden must the non-moving party produce evidence to rebut the moving party's claim. If the non-moving party establishes the presence of a genuine issue of material fact, then the motion will be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).

**ANALYSIS**

**1.    PATENTABLE SUBJECT MATTER**

**1.1    Legal Standard**

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. "[T]his provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are

1   not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quoting *Association*

2   *for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)). The Supreme Court has

3   "described the concern that drives this exclusionary principle as one of pre-emption." *Id.* That is,

4   "[l]aws of nature, natural phenomena, and abstract ideas are the basic tools of scientific and

5   technological work," and "monopolization of those tools through the grant of a patent might tend

6   to impede innovation more than it would tend to promote it, thereby thwarting the primary object

7   of the patent laws. . . . *see* U.S. Const., Art. I, § 8, cl. 8 (Congress 'shall have Power . . . To promote

8   the Progress of Science and useful Arts')." *Id.* (some internal citations, quotations, and

9   modifications omitted).

10      "Accordingly, in applying the § 101 exception, we must distinguish between patents that

11  claim the 'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into

12  something more, thereby 'transform[ing]' them into a patent-eligible invention." *Id.* (citations

13  omitted.) The Supreme Court has established a two-part test to make that distinction. "First, we

14  determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so,

15  we then ask, '[w]hat else is there in the claims before us?'" *Id.* at 2355 (quoting *Mayo Collaborative*

16  *Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289, 1296-97 (2012) (citation omitted)). "To answer

17  that question, we consider the elements of each claim both individually and 'as an ordered

18  combination' to determine whether the additional elements 'transform the nature of the claim' into a

19  patent-eligible application." *Id.* (quoting *Mayo*, 132 S. Ct. at 1297-98). "We have described step two

20  of this analysis as a search for an 'inventive concept'—i.e., an element or combination of elements

21  that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent

22  upon the [ineligible concept] itself.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1294).

23      Judges of this Court have recognized that the two steps of the *Alice/Mayo* test "are easier to

24  separate in recitation than in application." *Wolf v. Capstone Photography, Inc.*, Case No. CV 13-09573

25  CAS, Dkt. No. 49 at 17 (C.D. Cal. Oct. 28, 2014) (quoting *Eclipse IP LLC v. McKinley Equip. Corp.*,

26  No. SACV 14-00742 GW, 2014 WL 4407592, at *2-3 (C.D. Cal. Sept. 4, 2014) ("Describing this as a

27  two-step test may overstate the number of steps involved.")). But it is clear that "the mere

28

1  recitation of a generic computer cannot transform a patent-ineligible abstract idea into a

2  patent-eligible invention."  *Alice*, 134 S. Ct. at 2358.

3        Recitation of generic computer implementation does not transform an abstract idea because

4  it is insufficient, for patent eligibility purposes, to either state an abstract idea "while adding the

5  words 'apply it'" or to limit  the use of an abstract idea "to a particular technological environment."

6  *Id.* (quoting *Mayo*, 132 S.Ct. at 1294, *Bilski v. Kappos*, 561 U.S. 593, 610-611 (2010)).  "Stating an

7  abstract idea while adding the words 'apply it with a computer' simply combines those two steps,

8  with the same deficient result.  Thus, if a patent's recitation of a computer amounts to a mere

9  instruction to 'implemen[t]' an abstract idea 'on . . . a computer,' that addition cannot impart patent

10  eligibility."  *Id.* (citations omitted).

12  **1.2    Application**

14      *1.2.1*  **Mayo** *Step One*

16      Drawing on statements made by Ameranth and the examiner during prosecution of the

17  patents, Defendants first suggest that the claims are directed to "operational support for dealer

18  function" and "dealer coordination functions."  (Dkt. 216 at 11.)  Because dealers are employees of

19  a casino, and because the "dealer functions" and "dealer coordinator functions" pertain to

20  scheduling, Defendant then contends that "the abstract concept at [a] 'reasonably high level of

21  generality'" is "employee scheduling."  (*Id.*)

22      Plaintiff responds that the challenged claims are not "directed to" the abstract idea of

23  "employee scheduling," and that Defendants "excessive[ly] focus on the dependent claims, as

24  opposed to the independent claims from which they depend."  (Dkt. No. 243 at 8-9.)  Plaintiff urges

25  the Court to deny the § 101 Motion because it "fail[s] to plausibly identify an 'abstract idea' to which

26  the challenged claims are directed," just as the Court ruled on Defendants' previous § 101 motion

27  (*Id.* at 9.)  Plaintiff suggests that the challenged claims are "directed to" a variety of purposes, and

28

1    suggests "public display of dealer information in a poker room in support of poker room

2    operations" as an example.  (*Id.* at 10-11.)

3        In their Reply, Defendants take issue with the fact that Plaintiff only criticizes Defendants'

4    proposed abstract idea, and "does not propose an 'abstract concept' for the court's consideration."

5    (Dkt. No. 260 at 4.)  Defendants argue that every patent must be "directed to" either a law of

6    nature, natural phenomenon, or abstract idea for purposes of *Mayo* step 1.  (Dkt. No. 260 at 4.)

7        Not so.  Defendants' misconception appears to arise from the statement that "[a]t some

8    level, 'all inventions . . . **embody, use, reflect, rest upon, or apply** laws of nature, natural

9    phenomena, or abstract ideas." *Alice*, 134 S. Ct. at 2354 (quoting *Mayo*, 132 S. Ct. at 1293) (emphasis

10   added).  But *Alice* did not hold that all inventions **are directed to** one of the three ineligible

11   categories.  Defendants' reading is contrary to the Supreme Court's articulation of the test:  "First,

12   we determine **whether** the claims at issue are directed to one of those patent-ineligible concepts."

13   *Id.* at 2355 (emphasis added).  For the word "whether" to have any meaning, there must be at least

14   some patent claims that are not "directed" to laws of nature, natural phenomena, or abstract ideas.

15   True, it is difficult to understand the difference between (1) a claim "directed" to an abstract idea

16   but saved by an "inventive concept," and (2) a patent not "directed" to an abstract idea in the first

17   place, but that nonetheless can be said to "embody, use, reflect, rest upon, or apply" an abstract

18   idea.  *Id.* at 2354.  But in patents, no less than all other areas of the law, Courts must do their best to

19   follow Supreme Court rulings, no matter how unsatisfying.

20       That doctrinal wrinkle aside, Defendants' proposed abstract idea, "employee scheduling" is

21   found in the dealer-related claims of the '650 and '909 Patents.  A more precise articulation of any

22   abstract ideas in the claims might be possible, but the Court considers the abstract idea as stated by

23   Defendants.

24

25       *1.2.2*  **Mayo** *Step Two*

26

27       Moving to the second step of the § 101 analysis, "we consider the elements of each claim

28   both individually and 'as an ordered combination' to determine whether the additional elements

7

1   'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355

2   (quoting *Mayo*, 132 S. Ct. at 1297-98).

3   Defendants point out that in the second step of the analysis, conventional activity must be

4   ignored because it cannot transform an abstract idea into patentable subject matter.  (Dkt. No. 216

5   at 12-13.)  Defendants then suggest that because "all of the limitations of each respective

6   independent claim 1 have already been conclusively established as *not providing patentable subject* matter

7   by the reexaminations, the second step under *Mayo* should be directed to whether the subject

8   [matter] of dependent claims 2, 3 and 4 of the '909 Patent and claims 6 and 7 of the '650 Patent that

9   were confirmed are directed to a patent eligible invention."  (*Id.* at 12 (emphasis Defendants').)

10  Defendants conflate the principle of patentable subject matter with patentability generally.

11  In the reexaminations, an examiner found that each independent claim 1 was unpatentable as

12  obvious under 35 U.S.C. § 103(a).  (February 7, 2012 Action Closing Prosecution, USPTO Control

13  No. 95/001,698 at 45-46; November 8, 2012 Final Rejection, USPTO Control No. 90/011,859 at 3-

14  10.)  Patentable subject matter is a separate issue, governed by § 101 and the judicial exceptions to

15  the statute.  Subject matter eligibility was not at issue in the reexaminations of the '650 and '909

16  Patents, and the examiner made no findings about patentable subject matter.

17  Further, the cancellation of claims during reexamination requires only a showing of invalidity

18  by a preponderance of the evidence, rather than the clear and convincing evidence required for

19  invalidation by an Article III court.  So it would be wrong to view the reexamination results as even

20  suggesting, let alone conclusively establishing, that either patent's independent claim failed § 101.

21  Thus, the Court must consider all elements of each challenged claim, not just the additional

22  limitations recited in the dependent claims.

23

24  ### 1.2.3   The '909 Patent

25

26  While canceled in reexamination, claim 1 of the '909 Patent is the basis for some of the

27  challenged dependent claims of that patent, and is the most broadly drafted of the three

28  independent claims relevant to this case.  Claim 1 and its challenged dependent claims recite:

8

1.  A system for real time operational support of casino dealer coordinator functions

comprising:

a suite of computerized dealer coordinator application software programs

linked together to provide real time operational support for casino

dealer coordinator gaming functions, said suite including programs

configured to facilitate electronic scheduling and dealer rotation

functions in support of casino dealer coordinator functions;

a central database for storing said suite of dealer coordinator application

software programs and other data;

an application software program server for facilitating execution of said dealer

coordinator application software programs;

at least one client computing or display device on which said dealer

coordinator application software programs or data are configured to be

executed, linked or displayed; and

at least one user interface associated with the at least one client computing or

display device, said user interface being configured to display and/or

enable initiation, execution, and interaction with the application

software programs and data stored on the central database;

wherein said application software program server enables communication and

transmission of data between the central database and the at least one

client computing or display device; wherein the central database,

application software program server, at least one client computing or

display device and application software programs are configured to

facilitate integrated real time operational support for casino dealer

coordinator functions and wherein information generated by or

associated with a particular application software program is configured

to be used during execution of another related gaming application

software program.

2.  The system of claim 1 wherein at least one of the application software programs of the suite of programs is configured to facilitate public display of dealer information.

3.  The system of claim 1 wherein at least one of the application software programs of the suite of programs is configured to facilitate the creation, modification or display of dealer schedules.

4.  The system of claim 1 further configured to facilitate creation, modification, generation or display of dealer schedules and breaks based on dealer preferences or other criteria.

Taken alone, the further limitations recited in claims 2-4 would not move the abstract idea of "employee scheduling" past *Mayo* step 2.  First, the narrowing from "employers" to "dealers" in a casino is insufficient because "the prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment.'"  *Bilski v. Kappos*, 561 U.S. 593, 610 (2010) (quoting *Diamond v. Diehr*, 450 U.S. 175, 191-92 (1981)).  And the implementation through "software programs" only requires implementation on a general purpose computer, which does not transform an abstract idea into patentable subject matter.  *Alice*, 134 S.Ct. at 2357.  The question, then, is whether the additional system elements of claim 1, considered as a whole together with the material of the dependent claims, are sufficient to transform the dependent claims into patent-eligible subject matter.  But because Defendants incorrectly argue that the Court should ignore the elements of the cancelled independent claims, Defendants have not accounted for either (1) the majority of the elements of the challenged claims, or (2) the claims as a whole.

The elements of claim 1, which are incorporated by reference into claims 2-4, include "a suite of computerized dealer coordinator application software programs linked together to provide real time operational support for casino dealer coordinator gaming functions, said suite including programs configured to facilitate electronic scheduling and dealer rotation functions in support of casino dealer coordinator functions," as well as accompanying computer system components for

10

1  implementing the software suite.  ('909 Patent 33:54-34:21.)  The computer system components are

2  "a central database for storing said suite of . . . programs and other data," "an application software

3  program server for facilitating execution of said . . . programs," "at least one client computing or

4  display device," and "at least one user interface associated with the at least one client computing or

5  display device."  (*Id.* at 33:63-34:9.)

6      These computer system elements might only amount to a generic computer in the context of

7  implementing the claimed program suite.  But it is also possible that the computer system elements

8  combine to provide a sufficient "inventive concept" beyond the abstract idea.  This is a motion for

9  summary judgment.  The burden initially is on the moving party to show the absence of a genuine

10  issue of material fact.  *Celotex*, 477 U.S. at 322-23.  This burden of production is especially high here,

11  where the movant is seeking to have patent claims invalidated, because patents are entitled to a

12  presumption of validity under 35 U.S.C. § 282, and invalidity accordingly must be proven by clear

13  and convincing evidence.  *Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238, 2242 (2011).  While

14  Judge Mayer has urged in concurring opinions that "[b]ecause the PTO has for many years applied

15  an insufficiently rigorous subject matter eligibility standard, no presumption of eligibility should

16  attach when assessing whether claims meet the demands of section 101," but that approach has not

17  been adopted by the Federal Circuit.  *Ultramercial, Inc. v. Hulu, LLC*, __ F.3d __, No. 2010-1544,

18  2014 WL 5904902, at *9 (Fed. Cir. Nov. 14, 2014).

19      Drawing all inferences in favor of the nonmoving party, *Anderson*, 477 U.S. at 248, it is clear

20  that Defendants have not met their burden of production.  Defendants provide no analysis for the

21  majority of the elements of the challenged claims, instead relying only on USPTO reexamination

22  proceedings unrelated to 35 U.S.C. § 101 to argue that those elements are not patent-eligible.

23  Defendants therefore have not shown the absence of a genuine dispute of material fact as to the

24  invalidity of '909 Patent claims 2-4.

25      Claim 14 of the '909 Patent is identical to claim 1 except that it further recites "wherein said

26  system is configured to facilitate automatic generation of dealer schedules and rotations based on

27  predetermined criteria."  Claim 14 is thus almost identical in substance to claim 4, with the

28  exception that claim 14 recites "automatic" schedule and rotation generation, which does not appear

elsewhere.  The "automatic" limitation is a further aspect of the claim which, in combination with
the other elements, may contribute to a patent-eligible invention.  Defendants therefore have also
failed to show the absence of a genuine dispute of material fact as to the patentability of claim 14, or
its dependent claims 15-17, 18, 19, 21, 23, and 26.

Therefore, the Court DENIES the § 101 Motion as to the '909 Patent.

### 1.2.4   The '650 Patent

Claim 1 of the '650 Patent is largely similar to claim 1 of the '909 Patent, with the primary
difference being that claim 1 of the '650 Patent is directed to "a suite of computerized **gaming**
application software programs," rather than "a suite of computerized **dealer coordinator**
application software programs." ('650 Patent 35:2-67.)  Instead of programs "configured to
facilitate electronic scheduling and dealer rotation functions," '650 Patent claim 1 includes "software
programs configured to facilitate electronic player waitlisting and public display or marquee
functions." (*Id.* at 35:8-12.)  That is, the claim is directed to purposes besides employee scheduling.

In support of the claimed software functions, '650 Patent claim 1 includes an additional
computer system element, "at least one public display or marquee interface," as well as a number of
modifying "wherein" clauses related to player waitlisting functions.  (*Id.* at 35:21-30, 42-54.)
Dependent claims 6 and 7 add limitations that are similar in substance to the additional limitations
of claims 2-4 of the '909 Patent.  Claim 6 is directed to coordination of scheduling and rotation of
dealers, while claim 7 is directed to public display of casino poker dealer schedule information.  (*Id.*
at 36:15-22.)

The second step of the § 101 analysis for claims 6 and 7 of the '650 Patent is largely similar
to that for claims 2-4 of the '909 Patent provided in Section 1.2.3.  All of the physical computer
elements of '909 Patent claim 1, which Defendants do not address because it was invalidated during
reexamination, are also present in claim 1 of the '650 Patent.  And the '650 Patent also contains the
"public display or marquee interface," the "software programs configured to facilitate electronic
player waitlisting and public display or marquee functions," and the additional limitations related to

carrying out the player waitlisting functions.  These all recite additional features which might contribute to an "inventive concept" sufficient to transform the abstract idea of "employee scheduling" into patent-eligible subject matter.  Again, we do not have the benefit of Defendants' analysis on this point, to say nothing of Plaintiff's potential response.  Therefore, for the same reasons discussed in section 1.2.3, Defendants' have not shown the absence of a genuine dispute of material fact as to the patent eligibility of the challenged claims of the '650 Patent.

Therefore, the Court DENIES the § 101 Motion as to the '650 Patent.

## 2. WRITTEN DESCRIPTION AND ENABLEMENT

Defendants argue that the following claims are invalid because the written description and enablement requirements are not satisfied due to the inclusion of certain terms:

| Patent / Claim | Allegedly Defective Term(s) |
|---|---|
| '650 Patent, claims 6 and 7 | "dealer rotation," "dealer scheduling" |
| '909 Patent, claims 2, 3, 4, 14, and claims depending from claim 14 | "dealer rotation," "dealer scheduling" |
| '969 Patent, claim 1 and claims depending from claim 1 | "table availability database" |

(Dkt. No. 220 at 6-7.)

### 2.1 Legal Standard

35 U.S.C. § 112, ¶ 1 (2006), applicable to the patents in suit, provides:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is

1    most nearly connected, to make and use the same, and shall set forth the best mode

2    contemplated by the inventor of carrying out his invention.

3

4    "The purpose of this provision is to ensure that the scope of the right to exclude, as set forth in the

5    claims, does not overreach the scope of the inventor's contribution to the field of art as described in

6    the patent specification." *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000).  35 U.S.C.  §

7    112, ¶ 1 sets forth three separate but related requirements, only two of which are at issue here:

8    written description and enablement.  *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1347

9    (Fed. Cir. 2010) (en banc) (holding that the written description and enablement requirements are

10   separate).

11       The written description requirement "requires a patentee to provide a written description

12   that allows a person of skill in the art to recognize that the patentee invented what is claimed."

13   *Synthes USA, LLC v. Spinal Kinetics, Inc.*, 734 F.3d 1332, 1341 (Fed. Cir. 2013) (citing *Ariad* 598 F.3d

14   at 1351).  "Determination of whether a patent satisfies the written description requirement is a

15   question of fact."  *Id.* (citations omitted).  "The level of detail required to satisfy the written

16   description requirement varies depending on the nature and scope of the claims and on the

17   complexity and predictability of the relevant technology."  *Id.*

18       The enablement requirement "requires that the specification of a patent must enable a

19   person skilled in the art to make and use the claimed invention."  *In re Wands*, 858 F.2d 731, 735

20   (Fed. Cir. 1988).  Compliance with the enablement requirement is a question of law, based on

21   underlying facts.  *Id.*  Factors to be considered in determining whether the specification has enabled

22   those in the art to make and use the invention without undue experimentation include: "(1) the

23   quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the

24   presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior

25   art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8)

26   the breadth of the claims."  *Id.* at 737.  Although the knowledge of one of skill in the art is relevant

27   to enablement, "[i]t is the specification, not the knowledge of one skilled in the art, that must supply

28

14

the novel aspects of an invention in order to constitute adequate enablement." *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997).

### 2.2    Application - '969 Patent

Defendants argue that the term "table availability database" occurs only in the claims of the '969 Patent, and that the specification lacks any description of a "table availability database" or how such a database could communicate or synchronize with any other database.  (Dkt. No. 220 at 9.) The bulk of Defendants' argument on this issue merely argues that Plaintiff emphasized the importance of the term when opposing Defendants' prior § 101 invalidity motion.  (*Id.* at 7-10.) Defendants make no prima facie showing that a person of ordinary skill in the art would be unable to practice a "table availability database" without undue experimentation.  Unlike the terms challenged in the '909 and '650 Patents, discussed in Section 2.3, Defendants' expert does not even address the enablement of "table availability database" term in his declaration.  Defendants have therefore failed to shift the burden concerning enablement.

Defendants have pointed out that the phrase "table availability database" does not appear in the specification, which is sufficient to shift the burden of production on the written description issue.  *Celotex*, 477 U.S. at 322-23.  Plaintiff responds that although the exact phrase "table availability database" only occurs in the claims, the specification contains a number of references adequately describing the component.  (Dkt. No. 244 at 8.)  Plaintiff specifically identifies the following:

- "Table Inventory" (col. 19, lines 55-59)
- "Game Manager" (col. 25, lines 16-32, and Figs. 23-24) and "Casino Manager" (col. 19, lines 38-54) functionality, both of which include "interacting with the database" – allowing "various poker tables to be designated as active or inactive" (their "availability status")

1        •     "Open Game" (col. 25, lines 33-37, and Figs. 25-28), e.g. "selected table is

2              added to database" (Fig. 26)

3        •     "Close Game" (col. 25, lines 40-44, and Figs. 29-32), e.g., "Database removes

4              table entry for specific game" (Figs. 30, 31); and "App Server runs SQL to

5              database to find active status of specified table"

6        •     "Active Game Display" (col. 25, lines 55-58) ("display showing the active

7              tables and associated games within a pit or specialized gaming room")

8        •     "Inactive Game Display" (col. 25, lines 59-62) ("A display showing the inactive

9              tables and associated games within a pit or specialized gaming room")

10       •     "Seating Capacity" (col. 26, lines 1-5) (Display real-time seating capacity. The system

11              calculates the number of active tables and active seats).

12  (Dkt. No. 244 at 8-9 (some formatting altered).)

13        Although the specification does not use the phrase "table availability database," the excerpts

14  cited above may provide a description of a database coupled with table and seat availability

15  functions.  Drawing all inferences in favor of the non-moving party, this description may be

16  sufficient to show possession or actual invention of the "table availability database" limitation.

17  "[T]he written description requirement does not demand a particular form of disclosure, or that the

18  specification recite the claimed invention *in haec verba*."  *Ariad*, 598 F.3d at 1352 (internal citation

19  omitted).  Thus, Plaintiff has at least created a genuine dispute of material fact regarding the

20  sufficiency of the written description of "table availability database" in the '969 Patent.

21        Therefore, the Court DENIES the § 112 Motion as to the '969 Patent.

22

23

24

25

26

27

28

**2.3     Application - '650 Patent and '909 Patent**

### 2.3.1   "Dealer Rotation" and "Dealer Scheduling"

Defendants argue that the terms "dealer rotation" and "dealer scheduling" in the '650 and '909 Patents render the relevant claims invalid for failure to meet the written description and enablement requirements.  (Dkt. No. 220 at 10.)  Defendants acknowledge that the specification contains some discussion of dealer rotation and dealer scheduling, but argue that those elements are found only in 19 lines of the specification and five referenced figures for a module titled "Dealer Coordinator."  (*Id.* at 11.)  Defendants cite the following passage from the specification:

"Dealer Coordinator"

Dealer feature allows dealers and authorized personnel to perform dealer preferences and dealer scheduling. The feature allows dealers to register themselves into the system upon the beginning of a work shift. The system using random generation schedules dealers for certain games and breaks based upon preloaded dealer preferences. Cross referencing available Dealer pools to cover lost shifts and table dealer necessities.

FIG. 82 is an illustration showing the Dealer Coordinator actors and functions.

FIG. 83 is a diagram of the process for Dealer Rotation.

FIG. 84 is an illustration of a graphical user interface which shows the View Rotation display this user interface shows information regarding various shifts, and responsibilities of personnel in the shifts.

FIG. 87 is an illustration of a graphical user interface which shows the Dealer Coordinator Create Rotation screen.

FIG. 88 is an illustration of a graphical user interface which shows the Dealer Coordinator Re-Assign screen.

('909 Patent 23:24-43.)  Figures 82, 84, 87, and 88 are reproduced on the following two pages:



**FIG. 82**

**FIG. 84**



**FIG. 87**



**FIG. 88**

Defendants argue that the disclosure of the "dealer rotation" and "dealer scheduling" in the portion of the specification just provided and the corresponding figures "are nothing more than a recitation of desired functionality for dealer coordination" that does not demonstrate that the inventors actually invented programs configured to facilitate electronic dealer scheduling and rotation, let alone teach a person of ordinary skill in the art how to implement those functions without undue experimentation.  (Dkt. No. 220 at 12.)  To support this argument, Defendants submitted a declaration by a computer programming expert.  (Decl. of William C. Easttom II ("Easttom Decl."), Dkt. No. 220-2.)  Easttom opines that:

- "[O]ne of ordinary skill in the art would want to know what are the dealer preferences and where are they preloaded, and what algorithm is used to facilitate random generation." (Easttom Decl. at ¶ 9.)

- "The five figures add nothing because they are nothing more than high-level drawings illustrating functionality and the 'look and feel' that is desired for an interface" without teaching a person of ordinary skill in the art how to implement the functions.  (*Id.* at ¶ 10.)

- "After reviewing the four sentence disclosure and the accompanying five figures . . . one of ordinary skill in the art would have to create the software programs from scratch with no direction so as to perform the desired functionality of dealer rotation and dealer scheduling." (*Id.* at ¶ 11.)

Easttom also states that he reviewed over 900 pages of programming source code, written in Java, that accompanied the patent, but could not locate any dealer rotation or dealer scheduling functionality within the source code.  (*Id.* at ¶ 12.)

Defendants point out that during prosecution of the '650 Patent, the applicant argued that the prior art did not disclose "detailed rotation/scheduling algorithms for controlling all the operations of a modern poker room . . . [and therefore] does not describe the claimed dealer functions or the display of information related to dealer functions."  (Dkt No. 220 at 16 (citing August 2, 2007 Response to Non-Final Office Action, Dkt. No. 206-16 at 33.)  Defendants argue that because no "detailed rotation/scheduling algorithms" are described in the specification, the

patents' reference to dealer rotation and scheduling functions is nothing more than a "wish or plan for obtaining the claimed invention," which fails the written description requirement.  (Dkt. No. 220 at 17 (citing *Boston Scientific Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1362 (Fed. Cir. 2011).)

As to enablement, Defendants argue that the "intended enabling disclosure" for "dealer rotation" and "dealer scheduling" takes up only "19 lines in the specification and five referenced figures for a module titled 'Dealer Coordinator,'" and that this disclosure of "desired functionality" would not "teach[] a person of ordinary skill in the art how to implement the electronic scheduling and dealer rotation functions, and the automatic generation thereof, without undue experimentation."  (Dkt. No. 220 at 11-12.)

Defendants' enablement arguments, together with the Easttom Declaration, address only three of the *Wands* factors to be considered in evaluating enablement.  Discussion of the first factor, "the quantity of experimentation necessary," is limited to conclusory statements that undue experimentation would be required.  (*Id.* at 10, 12.)  Defendants also state that "one of ordinary skill in the art **would want to know** what the dealer preferences are and where they are preloaded, and what algorithm is needed to facilitate random generation," and "one of ordinary skill in the art **would desire to know** more about the table dealer necessities."  (*Id.* at 13.)  But these statements do not show that these features could not be implemented without undue experimentation.

For the second factor, "the amount of direction or guidance presented," the Easttom Declaration states that the specification provides "no flow charting," "no discussion of a series of steps to implement the desired functionality," and "no algorithm disclosed . . . for performing the desired functionality."  (Dkt. No. 220-2 at ¶ 15.)  As to the third factor, "the presence or absence of working examples," the Easttom Declaration does provide the relevant factual assertion that the declarant "reviewed over 900 pages of programming source code that accompanied the patent," and "could not locate any dealer rotation or dealer scheduling functionality within that source code."  (*Id.* at ¶ 12.)

1    Although Defendants provide facts relevant to two *Wands* factors, they do not state how

2    those facts adequately support their enablement position.  Defendants do not address the other five

3    factors, nor do they address why the second and third factors by themselves should be dispositive.

4    Plaintiff responds that Defendants' analysis ignores the teachings of the figures relevant to

5    dealer scheduling and rotation, as well as many other references to dealer coordination in the

6    specification.  (Dkt. No. 244 at 11.)  In support of its position, Plaintiff submitted its own expert

7    declaration.  (Decl. of Michael I. Shamos ("Shamos Decl."), Dkt. No. 244-4.)

8    As to enablement, Shamos opines that Defendants' expert did not adequately or correctly

9    define a "person of ordinary skill in the art," and that the correct definition would be someone with

10   "at least a bachelor's degree in computer science, or equivalent experience, and at least five years'

11   experience in developing and coding complex, real time client/server-based software/hardware

12   systems" and "at least one year of exposure to casino operations."  (Shamos Decl. ¶ 14.)  Shamos

13   also provides a list of textbooks and articles available at the time of filing, which would have been

14   familiar to persons of ordinary skill in the art and which provide guidance to the skilled artisan on

15   how to implement scheduling functions.  (*Id.* at ¶ 18.)  Shamos opines that given the nature of the

16   invention, the state of the prior art, the relative skill of those in the art, and the predictability of the

17   art (*Wands* factors 4-7), the disclosure is adequate.  (Shamos Decl., Dkt. No. 244-4 ¶¶ 21-26.)

18   As to written description, Shamos opines that the requirement is satisfied as to "dealer

19   rotation" and "dealer scheduling, (*Id.* at ¶ 15), citing the following portions of the specification:

20   •    23:58-24:11, stating that the dealer coordinator feature allows dealers to register themselves

21        at the beginning of the shift, and the system uses random generation of dealer schedules

22        based on preloaded preferences.  (*Id.* at ¶ 16.)

23   •    Figs. 82-84 and 87-88, which show the dealer coordinator actors and functions, the process

24        for dealer rotation, a graphical user interface showing information regarding shifts and

25        responsibilities during shifts, the graphical user interface used for creating dealer rotations,

26        and the graphical user interface showing the dealer reassignment function.  (*Id.*)

27

28

1    Defendant's arguments are weak, but even if they sufficed to shift the burden to Plaintiff,

2  Plaintiff's targeted factual responses have raised genuine issues of material fact as to the enablement

3  and written description issues in the '650 and '909 Patents concerning "dealer rotation" and "dealer

4  scheduling."

5

6                **2.3.2  "Public Display of Dealer Information"**

7

8    Defendants' § 112 Motion also contains a paragraph arguing that '650 Patent claim 7 and

9  '909 Patent claim 2 fail the written description requirement as to the "public display" functionality

10  because those claims recite "at least one of the application software programs of the suite of

11  programs [be] configured to facilitate public display of" "dealer information" ('909 Patent claim 2)

12  or of "dealer scheduling and/or rotation information" ('650 Patent claim 7).  (Dkt. No. 220 at 17.)

13  Defendants argue that the specification nowhere discloses that any dealer information is displayed

14  for "viewing by a multiplicity of players or prospective players" as required by the Court's

15  construction of "public display."  (*Id.*)  Plaintiff responds that "the specification and drawings are

16  replete with 'public displays,'" and that "almost all of the claims include such functionality" on

17  "public displays."  (Dkt. No. 244 at 18.)

18    Indeed, the '650 Patent's specification describes "[p]roviding a visual display of game

19  information, including active and inactive tables, the current dealer at an active game . . . . This

20  allows players to see this information easier, and does not require casino employee interaction."

21  ('650 Patent 11:62-12:2.)  And as to the enablement of this limitation, Plaintiff's expert opines that

22  the specification, including figures 82-84, 87, and 88, would provide sufficient instruction for a

23  person of ordinary skill in the art to practice the claimed public display of dealer information.

24  (Shamos Decl., Dkt. No. 244-4 ¶¶ 17, 21.)  Again, Plaintiff has raised genuine issues of material fact

25  regarding the written description of "public display" in the '650 and '909 Patents.

26

27

28

### 2.4    Conclusion - Written Description and Enablement

The Court rules as follows:

| Patent / Claim | Allegedly Defective Term(s) | Ruling |
|---|---|---|
| '650 Patent, claims 6 and 7 | "dealer rotation," "dealer scheduling" | Summary judgment denied. |
| '909 Patent, claims 2, 3, 4, 14, and claims depending from 14 | "dealer rotation," "dealer scheduling" | Summary judgment denied. |
| '969 Patent, claim 1 and claims depending from 1 | "table availability database" | Summary judgment denied. |
| '650 Patent claim 7, '909 Patent claim 2 | "public display' | Summary judgment denied. |

## 3.    OBVIOUSNESS

### 3.1    Legal Standard

"A patent for a claimed invention may not be obtained . . . if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains."  35 U.S.C. § 103.  Factors to be considered in the obviousness analysis include (1) "the scope and content of the prior art," (2) "differences between the prior art and the claims at issue," (3) "the level of ordinary skill in the pertinent art," and (4) other objective evidence of nonobviousness.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 405 (2007) (citing *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 15-17 (1966)).

1      **3.2    Application**

2

3      In reexaminations, the USPTO canceled '650 Patent claims 1-5 and 8-25, and '909 Patent

4  claims 1, 5-10, and 12-13.  (Dkt. No. 220 at 17-18.)  Defendants argue that the USPTO's

5  invalidation of those claims mandates the Court's invalidation of certain other claims that the

6  USPTO did not invalidate.  (*Id.* at 18.)  Defendants argue that '650 Patent dependent claim 6 only

7  adds to canceled claim 1 the requirement that the software "be configured to facilitate electronic

8  scheduling and dealer rotation functions in support of casino dealer coordinator functions," but that

9  claim 1 **of the '909 Patent** already requires nearly identical language.  (*Id.* (emphasis added).)

10 Defendants then argue that dependent claim 6 of the '650 Patent should be rejected as obvious over

11 claim 1 of the '909 Patent.  (*Id.*)  But the cited functions are just one element of claim 6 of the '650

12 Patent, and while the presence of those functions was insufficient to save '909 Patent claim 1, '650

13 Patent claim 6 provides a different combination—one that the USPTO did not reject during

14 reexamination.  Defendants here want the Court to accept the arguments the USPTO accepted and

15 to accept the arguments the USPTO rejected.

16     Defendants make a similar argument for the obviousness of claims in the '969 Patent.  They

17 note that during the prosecution of the '969 Patent, the applicant filed a terminal disclaimer to

18 overcome a double-patenting rejection over the '650 Patent.  (*Id.*)  Defendants argue that because

19 "the claims of the '650 Patent have been invalidated"—actually, only some of them have—"the

20 claims of the '969 Patent must also be invalidated because they are patentably indistinct from the

21 invalid claims of the '650 Patent.  (*Id.*)  Defendants purport to attach a claim chart showing that "the

22 claims of the '969 Patent do not add any non-obvious limitations to the claims of the '650 Patent

23 that have been invalidated."  (*Id.*)  But the chart is unclear and at best, conclusory.  A short example:

24

25

26

27

28

| Claims of the '969 Patent | Claim Language from the '650 Patent |
|---|---|
| Claim 20. The method of claim 1, further comprising rollover functionality. | 4. The system of claim 1 wherein at least one of the application software programs of the suite of programs is configured to facilitate the creation, modification or display of tournament games. |

(Dkt. 220-5 at 25.)

It is unclear what the Court is supposed to understand from that comparison.  Defendants do not explain why "rollover functionality" is the same thing as a program "configured to facilitate the creation, modification or display of tournament games.  The same can be said for '969 Patent claim 1 element c, which requires "determining the seating availability for said particular player's poker game type preference from a table availability database including game types in real time," which Defendants juxtapose with language from '650 Patent claims 1 and 12 that discusses "generation and updating of a waitlist" or "actual wait times for games."  (*Id.* at 18.)

Defendants provide no analysis concerning the three primary obviousness factors: (1) the scope and content of the prior art; (2) differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the pertinent art.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 399 (2007) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966)).  Instead, Defendants rely on the argument that Plaintiff acquiesced in the USPTO's ruling that the patents were not patentably distinct when it filed a terminal disclaimer.  (Dkt. No. 220 at 18.)

Defendants infer too much from the terminal disclaimer.  The USPTO's Manual of Patent Examining Procedure ("MPEP") addresses this issue directly.  "The filing of a terminal disclaimer to obviate a rejection based on nonstatutory double patenting is not an admission of the propriety of the rejection."  MPEP § 804.02.  More specifically, "the filing of a terminal disclaimer simply serves the statutory function of removing the rejection of double patenting, and raises neither a presumption nor estoppel on the merits of the rejection."  *Id.* (internal quotation marks omitted).

1   The filing of a terminal disclaimer during prosecution of the '969 Patent therefore does not require

2   an obviousness holding here.

3          Defendants also do not adequately link up on a claim-by-claim basis (1) the claims in the '650

4   Patent rejected during reexamination and (2) the claims that Defendants urge the Court to now

5   reject.  Beyond the above examples, the chart relies on a mix-and-match approach.  To show that

6   '969 Patent claim 1 should be rejected based on the USPTO's rejection of certain '650 Patent claims,

7   the chart relies on '650 Patent claim 1 for some elements, but claims 14 and 15 for others.  (*Id.* at

8   20-21.)  In short, Defendants have not established the absence of genuine disputes of material fact

9   concerning their obviousness theory.

10         In its Opposition, Plaintiff argues that Genesis and Commerce are estopped from arguing

11  that the patents-in-suit are invalid due to the estoppel provisions of 35 U.S.C. § 315(c) and 35 U.S.C.

12  § 315(e).  (Dkt. No. 244 at 19.)  35 U.S.C. § 315(e)(2) provides that "[t]he petitioner in an inter

13  partes review . . . or privy of the petitioner, may not assert . . . in a civil action . . . that the claim is

14  invalid on any ground that the petitioner raised or reasonably could have raised during that inter

15  partes review."  Plaintiff argues that this estoppel provision applies here because Genesis made

16  similar obviousness arguments during the inter partes reexamination proceedings, and because

17  "Commerce was a privy to" those reexaminations.  (Dkt. No. 244 at 19-20.)  But Plaintiff has not

18  shown that Commerce was in fact a privy to the reexaminations.  In any event, the issue of estoppel

19  is moot because Defendants have failed to meet their burden as to obviousness, as discussed above.

20         Therefore, the Court DENIES summary judgment of obviousness.

21

22

23

24

25

26

27

28

1   **<u>DISPOSITION</u>**

2

3        The § 101 Motion is DENIED.  The § 112 Motion is DENIED.

4

5   IT IS SO ORDERED.

6   DATED: January 2, 2015.

7                                        _____

8                                             Andrew J. Guilford
                                            United States District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28